

EOD
11/17/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RALPH S. DUMAS and | § | Case No. 08-61190 |
| MICHELLE B. DUMAS | § | |
| | § | |
| Debtors | § | Chapter 7 |

## **MEMORANDUM OF DECISION**

This matter is before the Court to consider the "U. S. Trustee's Motion to Dismiss Pursuant to 11 U.S.C. §707(b)" (the "Motion") through which the Office of the United States Trustee ("UST") seeks a dismissal of the above-referenced case upon the assertion that the granting of a discharge to the Debtors, Ralph S. and Michelle B. Dumas, would constitute an abuse of the provisions of Chapter 7. At the conclusion of the hearing, the Court took the matter under advisement. This memorandum of decision disposes of all issues pending before the Court.[1]

*Factual Background*

Ralph Dumas has been employed in the commercial food sales industry since 2004. His wife, Michelle Dumas, is a homemaker who has taken primary responsibility for the care of their two children, ages 11 and 7.[2] As a person who had gained particular

---

[1] This Court has jurisdiction to consider the motion pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a). The Court has the authority to enter a final order in this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b).

[2] Over the relevant time period, Ms. Dumas has contributed income to the household only on a sporadic basis. She currently works 4 to 5 hours per week at an hourly rate of $11/hour.

expertise as a specialist in poultry cutting or portioning, Mr. Dumas brought to the household an annual income of almost $190,000 as recently as 2005 and 2006.[3]

In March 2005, during some of his highest earning years, Mr. Dumas and his wife bought a larger, older house in the historical Azalea District of Tyler for approximately $280,000. Though located in an upscale neighborhood, the home was dated, in need of significant repair, and was admittedly purchased as an ongoing project. The Debtors worked on repairs on a piecemeal basis as time permitted. In order to facilitate the repairs, the Debtors refinanced their mortgage in 2006, accessing an additional $35,000 which was spent to remedy leaking windows, to add insulation, and provide needed painting. Through this period, Ms. Dumas drove a leased vehicle while Mr. Dumas was driving a 2002 Chevrolet truck, the payments upon which were completed in October 2008. The Debtors also purchased a small, used trailer in 2005 which has been used primarily on hunting trips by Mr. Dumas and his sons.[4] Through 2006, the family was meeting its financial obligations in a timely manner.

However, due to company closures and other weaknesses in the poultry industry, Mr. Dumas has lost a significant portion of his income and has been forced to seek employment from three different employers since 2006. In that period he has suffered a

---

[3] The gross wages paid to Mr. Dumas have decreased as follows: 2005: $189,351; 2006: $190,240; 2007: $161,541; and 2008: $111,943. His current annual salary is approximately $100,000.

[4] It is uncontested that the trailer is worth $4500, with an indebtedness of approximately $3,000, serviced by a monthly payment of $126.56.

loss of income of almost 50%. Having been forced by industry pressures to abandon his particular expertise as a poultry cutter in order to maintain employment, Mr. Dumas is now essentially a trader of poultry commodities who offices in his home and his income has dropped from a high of $190,240 in 2006 to the current salary of approximately $100,000 per year.

The dropping income placed significant financial pressures on the Dumas family, notwithstanding the sizeable income still enjoyed by Mr. Dumas. As his employment status became unstable and his income dropped, his family mistakenly tried to maintain payments on their credit card indebtedness through the use of a line of credit, in the hopes that Mr. Dumas' income would soon be restored, but the income situation continued to worsen. Notwithstanding their worsening condition, the Debtors elected to execute a new lease in December 2007 on a new Suburban – creating an increase from $540 to $606 per month – because the leased vehicle was in disrepair at the end of the lease period and the Debtors believed, perhaps mistakenly, that a new lease obligation would be cheaper than exercising a purchase option on the older vehicle and entertaining the risk of ongoing repair bills. They attempted to limit or eliminate discretionary spending for dining, recreation and vacations. Throughout the period, the Debtors maintained all of their secured debt payments but, with the dropping income, they began to falter on payments on unsecured debt.

Finally, on December 28, 2008, Mr. and Ms. Dumas filed for relief under Chapter 7 of the Bankruptcy Code. In their schedules, they listed secured debts of $318,403.59,

and general unsecured debts of $109,052.06, composed primarily of credit card obligations. The current indebtedness on the house is approximately $315,000, secured by a asset value of approximately $300,000. The schedule of income discloses net income of $6,508.50 and current expenditures of $6,862.27, including a monthly mortgage payment of $2,791.38 and a monthly homeowner's insurance premium of $220.

After the case trustee's declaration of a "no-asset" estate and no action having been taken by the case trustee or by any affected creditor to prevent the award of a discharge to the Debtor, the UST filed the present motion, alleging that the granting of a discharge to Mr. and Ms. Dumas would constitute an abuse of the provisions of Chapter 7 under §707(b)(2) and §707(b)(3)(B). Thereafter, the UST abandoned his §707(b)(2) claim, having acknowledged at the hearing that the presumption of abuse does not arise under the calculations mandated by that subsection. Thus, the United States Trustee seeks dismissal solely upon its allegation that the totality of the Debtors' financial circumstances demonstrates that the granting of a Chapter 7 discharge to these Debtors would constitute an abuse of Chapter 7.

*Discussion*

Since the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), the chance that a Chapter 7 case may be dismissed for abuse have expanded. Rather than an environment in which an individual debtor with primarily

consumer debts[5] would enjoy a presumption in favor of receiving discharge relief, BAPCPA reversed that process and inserted a means test into §707(b) to determine whether a presumption of abuse should be imposed upon an above-median income debtor seeking Chapter 7 relief. When the presumption of abuse applies, a debtor's ability to rebut that presumption is extremely limited. Even when such a presumption does not arise, dismissal is still available either when the petition is filed in bad faith or when a court otherwise determines that the awarding of Chapter 7 relief would constitute an abuse under the "totality of the circumstances."[6] The movant bears the burden of demonstrating such abuse by a preponderance of the evidence.

---

[5] The term "consumer debt" is defined by the Bankruptcy Code as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. §101(8). In order for §707(b) to be applicable, the indebtedness of the debtor must be primarily consumer in nature. *In re Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988) ["Even if the filing of the petition is in fact a substantial abuse of the bankruptcy procedure, a case may not be dismissed under this provision unless this prerequisite is satisfied."]. "The test for determining whether a debt should be classified as a business debt, rather than a debt acquired for personal, family or household purposes, is whether it was incurred with an eye toward profit." *Id*. There is no dispute that the Debtors' debts in this case are primarily consumer in nature.

[6] Section 707(b) of the Bankruptcy Code now provides, in relevant part, that:

(1) After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee . . ., may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.
. . .
(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—
    (A) whether the debtor filed the petition in bad faith; or
    (B) [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

The adoption of the totality test in §707(b)(3)(B) reflects a legislative preference selected from various tests which had been developed and utilized by courts to determine the existence of substantial abuse in the pre-BAPCPA era. In the absence of any statutory guidance, this court and many others had followed the lead of the Sixth Circuit[7] and the Fourth Circuit[8] in applying a totality test in evaluating §707(b) motions prior to BAPCPA. *See, e.g., In re Faulhaber,* 243 B.R. 281, 284 (Bankr. E.D. Tex. 1999). Each court sought to identify those factors which, when combined with a demonstration of a debtor's ability to pay debts from future earnings, would reveal an abuse of the privilege to obtain a Chapter 7 discharge. However, in its adoption of the totality test, BAPCPA did not specify nor did it endorse any particular means by which to identify the existence of abuse. Thus, courts have continued to use the various totality factors identified in the pre-BAPCPA jurisprudence in order to evaluate current dismissal motions based upon §707(b)(3)(B). *In re King*, 2009 WL 62252, at *3 (Bankr. E.D. Tex. Jan. 15, 2009). Though the particular list of considerations may have varied slightly from court to court, they have generally included the following:

(1) <u>circumstances surrounding the debtor's finances in the past, including:</u>
    (a)    whether the debtor engaged in significant purchases on the eve of bankruptcy; and
    (b)    whether the debtor incurred cash advances or made consumer purchases which exceeded at that time his ability to pay.

---

[7] *In re Krohn*, 886 F.2d 123, 126-27 (6th Cir. 1989).

[8] *Green v. Staples (In re Green)*, 934 F.2d 568, 571 (4th Cir. 1991).

(2) <u>circumstances surrounding the debtor's finances in the future, including</u>:
    (a)    whether the debtor has a stable income;
    (b)    whether the debtor's budget is reasonable; and
    (c)    whether the debtor could pay a substantial portion of his debts from future income in a Chapter 13 case;[9]

(3) <u>circumstances surrounding the debtor's truthfulness, including</u>:
    (a)    whether the debtor's schedules and statements accurately reflect his true financial condition; and
    (b)    whether the debtor generally filed the case in good faith;[10] and

(4) <u>circumstances related to a legitimate need for filing, including</u>:
    (a)    whether the bankruptcy was filed due to sudden illness, calamity, disability or unemployment; or
    (b)    whether the debtor's financial predicament could have been better addressed through private negotiations or use of other state law remedies.

       The parties in this case agree that there is no troubling, pre-petition conduct by the Debtors as set forth in category #1. The Debtors acquired most of their indebtedness at a time when they could reasonably afford it and there were no last-minute, extravagant purchases by the Debtors prior to filing. Instead the Debtors possessed a legitimate need for a bankruptcy filing due to the continuing employment problems suffered by Mr. Dumas and the decreasing salary levels caused thereby, and there is no evidence that alternative strategies would have been more beneficial or advisable. The stability of the Debtors' income remains in question. The industry in which Mr. Dumas is engaged is

---

[9] Some courts have included in this column the pre-BAPCPA factor of whether the debtor was seeking to reaffirm secured debts at the expense of unsecured creditors. For the reasons set forth herein, that factor can no longer be considered extant.

[10] The oft-cited factor of investigating whether the petition was filed in bad faith has now been quantified as a separate ground for dismissal under §707(b)(3)(A) and should play a minor role at best in the totality analysis.

still in flux and the risk of further employment changes and income cuts, particularly given his peculiar role in that industry, is more than a mere possibility. The schedules reflect the Debtors' true financial condition and the Debtors have been generally truthful to their creditors and with the Court in their required disclosures, with the UST making no allegations to the contrary. Outside the general housing costs that are discussed below, the other budget categories asserted by the Debtors have either been documented or have gone unchallenged.[11]

The predominant factor legitimately raised by the evidence is the amount of the Debtors' monthly housing costs that, with insurance and taxes, totals almost $3,000. The house was not purchased at the last minute at the expense of creditors, but instead was acquired when the Debtors enjoyed a greater level of income. However, having implemented certain budget adjustments in an effort to keep their home despite their falling income, the Debtors have remained current on their housing obligation to their lender. That raises an interesting conundrum. Can the amount of a monthly house payment, which Congress has accepted and declared as completely deductible in the computations to determine the existence of presumed abuse under §707(b)(2), singularly support a finding of abuse under the totality of circumstances test of §707(b)(3)?

At first blush, the answer might appear to be yes. After all, "one of the purported goals of the means test and BAPCPA was to move more debtors to Chapter 13 in the

---

[11] Even if they had been raised by the UST, appropriate adjustments to categories other than housing costs would have been insufficient to create a significant return to creditors.

expectation of generating a return to unsecured creditors that would not be available in a Chapter 7." *In re Johnson*, 399 B.R. 72, 77 (Bankr. S.D. Cal. 2008). It is widely acknowledged that "a debtor's ability to repay her creditors plays some role when applying the totality-of-the-circumstances test of Section 707(b)(3)(B)," *In re Crink*, 402 B.R. 159 (Bankr. M.D.N.C. 2009),[12] and one can certainly find jurisprudence under which courts have proceeded to determine, under the totality of circumstances analysis, whether a debtor's monthly housing payment is reasonable and necessary.[13] That approach might be welcomed by this Court, given its propensity for close examination of the reasonableness of expenses in a Chapter 13 context, as well as its tendency to find abuse under §707(b) in the pre-BAPCPA past when debtors have sought Chapter 7 relief solely as a means "to clean their credit card palette." *See, e.g., In re Sartin*, No. 03-11166, slip op. at 10 (Bankr. E.D. Tex. Mar. 22, 2004). In an unfettered view of these circumstances, a mandated dismissal in this instance would arguably achieve the most just result, given that the Debtors' monthly mortgage payment now consumes almost 36% of their gross income and is almost 3½ times greater than the articulated IRS Local Standard for housing, thereby creating a sustainable foundation for the accusation that the Debtors are maintaining an expensive home at the expense of their unsecured creditors.

---

[12] *See also, In re Kibbe*, 361 B.R. 302, 314 (B.A.P. 1st Cir. 2007); *Pak v. eCast Settlement Corp. (In re Pak)*, 378 B.R. 257, 265 (B.A.P. 9th Cir. 2007).

[13] *See, e.g., In re McNamara*, 2009 WL 1606985, at *4 (Bankr. M.D. Pa. June 5, 2009); *In re Durczynski*, 405 B.R. 880 (Bankr. N.D. Ohio 2009) [but court also finding that the Debtors' financial situation was the result of circumstances reasonably within their control].

However, just results in bankruptcy cases must find their root in the provisions of the Bankruptcy Code. This Court has no freewheeling authority to reach a fair result and its discretion to declare the filing of this case as an abuse under these particular circumstances is simply absent. While the results of the means test do not exclusively determine a debtor's future ability to pay in all circumstances (e.g., in a surrender of collateral context), the statutory language composing the means test, specifically the language contained in §707(b)(2)(A)(iii),[14] cannot simply be ignored by the Court when it has a clear and direct application.

The UST relies solely upon the characterization of the Debtors' mortgage payment as unreasonable, with the amount thereby saved being purportedly sufficient to fund a Chapter 13 plan. However, in defining a future ability to pay for an above-median income debtor in a Chapter 13 context, §1325(b)(3) provides that: "Amounts reasonably necessary to be expended ... shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)...." Whether arising as a product of congressional intent or congressional blunder, §707(b)(2) fails to impose any limit on the amount of debt which

---

[14] That provision, one of three subtrahends designed to be subtracted from the debtor's current monthly income, provides that the debtor's average monthly payments on account of secured debts shall be calculated as the sum of —

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts.

can be legitimately secured by a principal residence for Chapter 7 purposes.[15] That failure (and the resulting allowance of the specified payment) clearly governs the determination of what constitutes a reasonably necessary housing expense for the purposes of §1325(b)(3).[16] Thus, "[b]ecause §707(b)(2) applies in both Chapter 13 and Chapter 11, and because §707(b)(2) has no cap on secured debt obligations for a primary residence, there is no greater ability to pay [realized] in a Chapter 13 or 11 than in a Chapter 7." *Johnson*, 399 B.R. at 77. Thanks to §707(b)(2)(A)(iii), the housing payment has been effectively immunized from scrutiny on the basis of reasonableness in a Chapter 13 or Chapter 11 case. Contrary to the position of the UST, the continued payment of the secured mortgage by the Debtors cannot constitute an improper allocation of financial resources when the Bankruptcy Code specifically endorses that allocation. Thus

---

[15] For an insightful discussion regarding legislative policy decisions favoring secured debt that were embedded into the Bankruptcy Code and why it is improper for a court to use the totality test to force debtors into defaulting on their secured debt obligations (to the detriment of the holders of such debt) as a precondition for obtaining Chapter 7 relief, see *In re Jensen*, 407 B.R. 378, 387-88 (Bankr. C.D. Cal. 2009). As the *Jensen* court concludes:

> [R]efusing to permit debtors to retain secured-debt property does more than punish the debtors — it also reallocates the balance of risk between secured and unsecured creditors [as implemented in the Bankruptcy Code]. . . . As demonstrated by the Means Test's provisions permitted the deduction of secured-debt obligations from CMI, Congress has conferred an advantage on secured creditors by giving debtors the option of retaining secured-debt property. Although Congress' choice to confer various advantages upon secured creditors is controversial, it is a legislative choice that the Court will not disturb. Of course, the unintended but unavoidable consequence of this Congressional decision to favor secured credit is that some debtors will be able to retain luxury goods if they are willing to continue making the secured debt payments, even if that means their unsecured creditors will not always be made whole.

Id. at 388.

[16] The allowance is further extended into the disposable income calculation for an individual debtor in Chapter 11. See 11 U.S.C. §1129(a)(15)(B).

precluded from attacking the reasonableness of the mortgage payment and admittedly without sufficient evidence to establish the existence or applicability of any of the other relevant "totality" considerations under §707(b)(3), the UST has failed to meet its burden of proof to demonstrate that the granting of a Chapter 7 discharge to these Debtors would constitute an abuse under the "totality of the circumstances" test of §707(b)(3). Accordingly, the Motion to Dismiss Pursuant to 11 U.S.C. §707(b) filed by the United States Trustee in the above-referenced case must be denied.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[17] pursuant to FED. R. CIV. P. 52, as incorporated into contested matters in bankruptcy cases by FED. R. BANKR. P. 7052 and 9014. A separate order will be entered which is consistent with this opinion.

Signed on 11/17/2009

*[signature: Bill Parker]*

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[17] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.